Bernard M. **BAUM** and Daniel S. Shulman, Plaintiffs-Appellants,

v.

**INVESTORS DIVERSIFIED SERVICES, INC.**, Defendant-Appellee.

No. 17051.

United States Court of Appeals Seventh Circuit.

April 18, 1969.

Ira Marcus, Donald A. Mitchell, Morrie Much, M. I. Mishkin, Chicago, Ill., for appellants.

Milton H. Cohen, W. Donald McSweeney, William A. Montgomery, Chicago, Ill., Breck P. McAllister, John E. Tobin, Richard L. Bond, New York City, Schiff Hardin Waite, Dorschel & Britton, Chicago, Ill., Roger W. Kapp, Donovan Leisure Newton & Irvine, Joseph F. Grinnell, New York City, of counsel, for appellee.

Before KILEY, FAIRCHILD and KERNER, Circuit Judges.

KILEY, Circuit Judge.

This is a class action seeking treble damages for alleged unlawful price discrimination in violation of Sec. 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a). The district court dismissed the complaint for failure to state a claim upon which relief can be granted. Rule 12 (b) (6), Fed.R.Civ.P. We affirm.

The well pleaded allegations of the complaint are admitted: Defendant, Investors Diversified Services, Inc. (IDS) acts as the sole investment adviser and exclusive underwriter and distributor of five open-end investment companies, collectively known as the "Investors Group" mutual fund. It has established a schedule of "cumulative quantity discounts" to its customers when selling Investors Group mutual fund shares.

The cumulative quantity discount practice is a sales load,[1] or commission, schedule, available to everyone, whereby lower sales loads are charged to large purchasers or holders of large blocks of Investors Group shares. The criterion for determining the lower rates is not merely the size of the block which an investor purchases at one time, but rather the size which he has accumulated. For example, a purchaser of a $500,000 block is charged the same commission rate as a purchaser of a $1,000 block who has already purchased an aggregate of $499,000 shares of Investors Group funds.

The sales load schedule established by IDS is:

| Aggregate Amount of Purchases | Present Quantity Discount Represented As Sales Charges From Per Cent Of Public Offering Price Since October 15, 1964 | Former Quantity Discount Represented As Sales Charges From Per Cent Of Public Offering To October 15, 1964 |
| --- | --- | --- |
| To $14,999 | 8% | 7½% |
| $15,000 to $19,999 | 7½% | 7% |
| $20,000 to $24,999 | 7% | 6½% |
| $25,000 to $29,999 | 6% | 6% |
| $30,000 to $39,999 | 6% | 5½% |
| $40,000 to $49,999 | 6% | 5% |
| $50,000 to $74,999 | 4% | 4½% |
| $75,000 to $99,999 | 4% | 4% |
| $100,000 to $199,999 | 2½% | 3½% |
| $200,000 to $399,999 | 2% | 3% |
| $400,000 to $699,999 | 1½% | 2½% |
| $700,000 to $999,999 | 1% | 2% |
| $1,000,000 and over | 1% | 1½% |

This type of cumulative sales load schedule has been approved by the Securities and Exchange Commission under its Rule 22d–1[2] which was issued under

1. "Sales load" means the difference between the price of a security to the public and that portion of the proceeds from its sale which is received and invested or held for investment by the issuer (or in the case of a unit investment trust, by the depositor or trustee), less any portion of such difference deducted for trustee's or custodian's fees, insurance premiums, issue taxes, or administrative expenses or fees which are not properly chargeable to sales or promotional activities. In the case of a periodic payment plan certificate, "sales load" includes the sales load on any investment company securities in which the payments made on such certificate are invested, as well as the sales load on the certificate itself. 15 U.S.C. § 80a–2 (a) (34).

2. A registered investment company which is the issuer of redeemable securities, a principal underwriter of such securities or a dealer therein shall be exempted from the provisions of section 22(d) to the extent necessary to permit the sale of such securities by such persons at prices which reflect reductions in, or eliminations of, the sales load under any of the following circumstances:

(a) (1) In accordance with a scale of reducing sales load varying with the quantity of securities purchased by any person. The quantity entitling any person to any such reduced sales load may be computed on any of the following bases, and may include redeemable securities of other registered investment companies having the same principal underwriter as the issuer of such securities: (i) The aggregate quantity of securities being purchased at any one time; (ii) the aggregate quantity or securities previously purchased or acquired and then owned plus the securities being purchased; * * *. 17 C.F.R. § 270.22d–1.

Sec. 22(d)[3] of the Investment Company Act of 1940.

The two named plaintiffs purchased an aggregate of $4,000 in shares and have been charged the maximum sales load. Under Rule 23, Fed.R.Civ.P., they represent all other buyer investor customers of IDS who were charged more than the minimum sales load. The alleged price discrimination basis of the action is directed against the cumulative quantity discount schedule set out above.

The district court dismissed the complaint on the ground, *inter alia*, that a mutual fund share is not a "commodity" within the meaning of Sec. 2(a) of the Clayton Act, as amended by the Robinson-Patman Act.

Section 2(a) of the Act, as amended, is literally limited to commodities. That section provides:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly re-

ceives the benefit of such discrimination, or with customers of either of them * * *.

The question narrows to whether a mutual fund share is a "commodity" and therefore subject to the Act's proscription.

A mutual fund share represents a fractional ownership in a large investment account. It is, in essence, a service contract between the investor and the investment company whereby the investor places his money in the hands of the investment company in expectation of realizing a financial gain. See Weisenberger Services, Investment Companies, Mutual Funds and Other Types 15–19 (1968). See also Carter, Mutual Investment Funds, 27 Harv.Bus.Rev. 715 (1949). The investment company is in turn bound to invest the entrusted funds and to conduct itself in a manner regulated by law. 1 Loss, Securities Regulation 144–153 (2d ed. 1961).

■ The word "commodity" is defined in two ways: (1) something of use, advantage or value, and (2) an article of trade or commerce, especially a product distinguished from a service. Random House Dictionary of the English language, 296. We think that Congress intended to limit the scope of the Act to the second definition of commodity, namely, a product as distinguished from a service.

Representative Patman explained the Act in these terms, which clearly emphasize the Act's application to tangible products:

* * * this bill insures to the independent dealer who buys one carload, whether of groceries, dry goods, hard-

---

**3.** No registered investment company shall sell any redeemable security issued by it to any person except either to or through a principal underwriter for distribution or at a current public offering price described in the prospectus, and, if such class of security is being currently offered to the public by or through an underwriter, no principal underwriter of such security and no dealer shall sell any such security to any person except a dealer, a principal underwriter or the issuer, except at a current public offering price described in the prospectus: *Provided, however,* That nothing in this subsection shall prevent a sale made

* * * * *

(iii) in accordance with rules and regulations of the Commission made pursuant to subsection (b) of section 80a–12 of this title. * * * 15 U.S.C. § 80a–22(d).

ware or any other commodity, the same price that is given to the chain buying 10 carloads of the same goods, unless that chain can show a concrete savings in cost resulting from its method of purchase and delivery, * * *

79 Cong.Rec. 9079, June 11, 1935.

Moreover, an application of the Act to mutual fund shares would render absurd its requirement in Sec. 2(a) that the commodities be of "like grade and quality," and its proviso in that section to allow prices to reflect "differences in the cost of manufacture, sale or delivery" and its proviso exempting price changes reflecting the "marketability of the good concerned. * * * "[4] See Rowe, Price Discrimination under the Robinson-Patman Act, 59–62 (1962).

We think, moreover, that the word "commodity" has the same meaning in both Sec. 2(a) and Sec. 3 of the Act. Section 3 of the Clayton Act, 15 U.S.C. § 14, renders illegal certain tying clauses in leases or sales of "goods, wares, merchandise, machinery, supplies, or other commodities * * *." Under the principle of *ejusdem generis* the word "commodities" is restricted to the same class of articles previously enumerated, all of which are tangible products.

This court has indicated that the word "commodity" as used in the Clayton Act is restricted to products, merchandise or other tangible goods. In Columbia Broadcasting System, Inc. v. Amana Refrigeration, Inc., 295 F.2d 375 (7th Cir. 1961), cert. denied, 369 U.S. 812, 82 S.Ct. 689, 7 L.Ed.2d 612 (1962), this court held that the word "commodity" as used in both Sections 2(a) and 3 of the Clayton Act did not include a contract right for television sponsorship. Judge Castle, speaking for a panel of this court, stated:

[W]e are of the opinion that the most reliable guide to the meaning of the word "commodity" is the context in which it is employed and in our considered judgment the context here— goods, wares, merchandise, machinery and supplies—does not permit an application of the term which embraces the contractual right or privilege of sponsorship identification with the broadcast of a television program * * *. *Id*. at 378.

Other courts have similarly restricted the scope of the word "commodity." Tri-State Broadcasting Co. v. United Press International, Inc., 369 F.2d 268 (5th Cir. 1966) (news information service not a "commodity" under Sec. 2(a) of the Clayton Act); Fleetway, Inc. v. Public Service Interstate Transp. Co., 72 F.2d 761 (3d Cir. 1934), cert. denied, 293 U.S. 626, 55 S.Ct. 347, 79 L.Ed. 713 (1935) (bus tickets not "commodities" under Sec. 2(a) of the Clayton Act); United States v. Investors Diversified Services, Inc., 102 F.Supp. 645 (D.Minn. 1951) (loan of money not a "commodity" under Sec. 3 of the Clayton Act).

█ Plaintiffs concede that services and intangibles are exempt from the Act, but argue that mutual fund shares are not services or intangibles. They admit they have found no case holding mutual fund shares to be commodities. In determining this issue we feel compelled to look at the dominant nature of a mutual fund share. See Tri-State Broadcasting Co. v. United Press International, Inc., 369 F.2d 268 (5th Cir. 1966); Fleetway Inc. v. Public Service Interstate Transp. Co., 72 F.2d 761 (3d Cir. 1934). It is not merely a piece of paper which happens to be a tangible thing. It is a representation of a fractional ownership in a large investment account. The rights which are owned—investment services and redemption rights—are intangible, and are not commodities.

The district court sustained defendant's motion to dismiss on three grounds.

4. In 1957 an amendment to Sec. 2(a) of the Act was proposed to expand the term "commodities" to include " * * * services other than professional services rendered by independent contractors."

This proposal was offered because Sec. 2(a) covered "only tangible commodities and not services." H.Rep. No. 607, 85th Cong., 1st Sess., p. 66 (1957). The proposed amendment failed of adoption.

However, we deem it unncessary to go beyond the first ground of dismissal— that plaintiffs' mutual fund shares are not commodities within the meaning of the Clayton Act. True, the district court referred to its conclusions on this ground as "tentative" and not explored "in great depth." However, we are not bound by these statements on what we consider a vital ground of precluding plaintiffs from recovery. In our view, mutual fund shares are not "commodities" as that term is used in Sec. 2(a) and consequently defendant's cumulative quantity discount practices cannot fall within the purview of the Act. Because of our holding, we do not pass on the other objections raised by defendant.

For the above reasons, the order of the district court is affirmed.