James **FREEMAN** et al., Plaintiffs-Appellants,

v.

**CHICAGO TITLE & TRUST CO.**, a corporation, et al., Defendants-Appellees.

No. 73–1619.

United States Court of Appeals, Seventh Circuit.

Argued June 5, 1974.

Decided Nov. 6, 1974.

---

Kenart M. Rahn, Richard A. Kerwin, Chicago, Ill., for plaintiffs-appellants.

Joseph J. Jaros, Jerome P. Croke, Herman Smith, Arthur T. McGivern, John T. Loughlin and John C. Christie, Jr., Russell, Bridewell & Lapperre, Irwin I. Zatz, Chicago, Ill., for defendants-appellees.

Before CLARK,* Associate Justice, and FAIRCHILD and STEVENS, Circuit Judges.

PER CURIAM.

The issue presented by this appeal is whether § 2(c) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(c), prohibits a title insurance company from paying secret rebates to agents of property owners in connection with the sale of title insurance. In their treble damage complaint, plaintiffs alleged that they had authorized the defendant savings and loans and other agents [1] (hereinafter Talman) to purchase title insurance [2] for them.

---

* Associate Justice Tom C. Clark (Retired) of the Supreme Court of the United States is sitting by designation.

1. Plaintiffs alleged that they and the defendant savings and loans each represented a class. No class determination, however, was made by the district court.

2. Title insurance is designed to protect property owners and mortgagees against loss through defects in the record title to real

Talman obtained policies solely from defendants Chicago Title & Trust Co. and Chicago Title Insurance Co. (hereinafter CT&T); without plaintiffs' knowledge, Talman received from CT&T a payment equal to 10.% of the amount paid as premiums by plaintiffs. The district court dismissed the complaint on the ground that § 2(c) has no applicability to payments made in connection with the sale of intangibles such as insurance. We affirm.

## I.

■ The dispute in this case centers largely around the proper reading of § 2(c) of the Clayton Act. The statute provides:

"(c) Payment or acceptance of commission, brokerage or other compensation.

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, *except for services rendered in connection with the sale or purchase of goods, wares, or merchandise,* either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid." (Emphasis added.)

Plaintiffs note that there is no comma between the words "rendered" and "in." Thus, they contend that the statute expressly prohibits commissions paid to the other party or his agent in any transaction in commerce, without limitation to transactions involving tangibles, and that the statutory reference to "in connection with the sale or purchase of goods, wares or merchandise . . . " limits the exception of "services rendered" and is not a limitation of the broad prohibition itself. The district court, however, read the statute as if a comma had been inserted between the two words. Under its reading § 2(c) has applicability only if "goods, wares, or merchandise." *i. e.,* tangibles,[3] are involved.

■ Section 2(c) was enacted as part of the Robinson-Patman Amendments to the Clayton Act. *See* Act of June 19, 1936, Pub.L.No. 74–692, § 2(c), 49 Stat. 1527. The courts have consistently interpreted the other provisions of the Robinson-Patman Act as being restricted to transactions involving tangible products.[4] In Baum v. Investors Diversified Services, Inc., 409 F.2d 872, 875 (7th Cir. 1969), for example, this court held that § 2(a) of the Clayton Act, 15 U.S.C. § 13(a), was so restricted. As one scholar has observed, the result reached in these decisions "comports with the Act's legislative history and textual structure." F. Rowe, Price Discrimination Under the Robinson-Patman Act 61 (1962). Since we find no affirmative evidence that Congress intended § 2(c) to be the only Robinson-Patman provision applicable to

property, risks not revealed by public records and expenses incurred while defending attacks made upon the title of the insured. *See generally* United States v. City of Flint, 346 F.Supp. 1282, 1284–1285 (E.D.Mich.1972).

3. In Baum *v.* Investors Diversified Services, Inc., 409 F.2d 872, 875 (7th Cir. 1969), this court made clear that the terms "goods, wares, or merchandise" as used in the Clayton Act refer solely to tangible products.

4. In addition to the authority cited in Baum, *supra* note 3, at 875, and Stutzman Feed Service, Inc. v. Todd & Sargent, Inc., 336 F.Supp. 417, 419 (S.D.Iowa 1972), see Morning Pioneer, Inc. v. Bismarck Tribune Co., 493 F.2d 383, 389 n. 11 (8th Cir. 1974); TV Signal Co. of Aberdeen v. AT&T Co., 462 F.2d 1256, 1259 (8th Cir. 1972); Export Liquor Sales, Inc. v. Ammex Warehouse Co., 426 F.2d 251, 252 (6th Cir. 1970), cert. denied, 400 U.S. 1000, 91 S.Ct. 460, 27 L.Ed.2d 451; Gordon v. New York Stock Exchange, Inc., 366 F.Supp. 1261, 1263 (S.D.N.Y.1973); LaSalle Street Press, Inc. v. McCormick & Henderson, Inc., 293 F.Supp. 1004, 1005 (N.D.Ill.1968), aff'd in part and rev'd in part on other grounds, 445 F.2d 84 (7th Cir. 1971).

intangibles,[5] we are satisfied that the district court's interpretation of this section is the proper one.[6]

Plaintiffs argue that this interpretation in effect requires judicial repunctuation of § 2(c) and that such is improper. The Supreme Court, however, has stated:

> "Punctuation marks are no part of an act. To determine the intent of the law, the court, in construing a statute, will disregard the punctuation, or will repunctuate, if that be necessary, in order to arrive at the natural meaning of the words employed."

United States v. Shreveport Grain & Elevator Co., 287 U.S. 77, 82–83, 53 S.Ct. 42, 44, 77 L.Ed. 175 (citing cases). In our opinion, it is appropriate to read § 2(c) as though it contained one more comma in order to effectuate apparent congressional intent.[7]

## II.

Insofar as title insurance bears the same qualities as any other insurance, it can properly be characterized as an intangible not subject to § 2(c).[8] According to plaintiffs, however, the purchaser of a CT&T policy is not as interested in insurance as he is in the report on the presence or absence of title defects which accompanies every policy; the "insurance aspect simply indemnifies the 'insured' against loss should the report as to the status of the title prove inaccurate." Pl.Br. at 41. Plaintiffs thus contend that, even if § 2(c) is limited to tangibles, it prohibits the alleged rebates because the report itself is a tangible physical document.

Assuming *arguendo* that plaintiffs' determination of the principal purpose of title insurance is correct,[9] we

---

5. It might be noted that, under plaintiffs' interpretation, § 2(c) would apparently prohibit the payment of a commission in connection with the purchase or sale of intangibles even if "services" had been rendered.

6. Other courts have, without extended discussion, reached this same conclusion. In Rangen, Inc. v. Sterling Nelson & Sons, Inc., 351 F.2d 851, 861 (9th Cir. 1965), cert. denied, 383 U.S. 936, 86 S.Ct. 1067, 15 L.Ed.2d 853, for example, the court stated:

> "It is necessary to the application of section 2(c) that the transaction between Rangen and the State of Idaho constitute a sale of 'goods, wares, or merchandise,' and not merely a contract for services."

Similarly, in Stutzman Feed Service, Inc. v. Todd & Sargent, Inc., *supra* note 4, 336 F.Supp. at 419, the court stated:

> "Cases cited by defendant involve 15 U.S.C.A. § 13(a) which uses similar, but not identical language, ('commodities' is not used in 15 U.S.C.A. § 13(c)) have limited the coverage of the act to the purchase of tangible personal property. . . . (citations omitted).
>
> "There has been no attempt to distinguish the language in these two sections and if a distinction were made, 13(c) which does not include commodities, would have to be considered the more restrictive. Patman, Complete Guide to the Robinson-Patman Act (1963), page 33."

7. *See* Webb-Crawford Co. v. FTC, 109 F.2d 268, 270 (5th Cir. 1940), cert denied, 310 U.S. 638, 60 S.Ct. 1080, 84 L.Ed. 1406, and C. Austin, Price Discrimination and Related Problems Under the Robinson-Patman Act 105 n. 203 (2d ed. 1959), where, albeit for reasons different than those involved in this case, it was concluded that placement of a comma between the words "rendered" and "in" would best effectuate the congressional purposes of § 2(c).

8. Referring specifically to § 2(a) of the Clayton Act, Representative Patman noted that, in

> "its broadest sense, the word 'commodity' might possibly include items of trade other than those in tangible form—for example, advertising, *insurance*, brokerage services, and similar items. However, the word is ordinarily used in the commercial sense to designate any movable or tangible thing that is produced or used as the subject of barter. This is the definition for the word 'commodity' used in the application of the Robinson-Patman Act."

W. Patman, Complete Guide to the Robinson-Patman Act 33 (1963) (emphasis added). The essentially intangible nature of insurance was also alluded to by this court in Columbia Broadcasting System, Inc. v. Amana Refrigeration, Inc., 295 F.2d 375, 378 (1961), cert. denied, 369 U.S. 812, 82 S.Ct. 689, 7 L.Ed.2d 612.

9. The validity of this determination might well be questioned. In *City of Flint, supra* note 2, 346 F.Supp. at 1285, for example, the court noted: "The sole object of title insurance is to cover possibilities of loss through defects that may cloud the title." Plaintiffs themselves alleged in their complaint that, when title insurance companies originated, they offered policies which were "designed"

must nevertheless reject their contention. The transfer of any intangible can rarely be accomplished without the "incidental involvement" of documents or other tangibles; consequently, it is the "dominant nature" of such transactions which determines whether they are subject to § 2(c).[10]

CT&T does provide purchasers of title insurance with a tangible, physical document. More importantly, however, it provides them with a professional service, namely, the search of records which might reveal a defect in the title and the rendering of an opinion based upon this search; the reports, like legal memoranda, are merely the embodiment of that service. Clearly, it is the performance of this service and not the delivery of a physical document which constitutes the dominant nature of the transaction between CT&T and its customers. *Compare Tri-State Broadcasting, supra* note 10. Since services are intangible, see *Baum, supra* note 3, at 875, even plaintiffs' characterization of title insurance's principal purpose is insufficient to invoke § 2(c).

### III.

■ Section 2(b) of the McCarran-Ferguson Act, 15 U.S.C. § 1012(b), contains the following proviso:

"[A]fter June 30, 1948 . . . the Act of October 15, 1914, as amended, known as the Clayton Act . . . shall be applicable to the business of insurance to the extent that such business is not regulated by State law."

Plaintiffs contend that § 2(b) is a substantive amendment to the Clayton Act which makes each of the provisions of this Act, including § 2(c), applicable to the insurance industry—regardless of whether the provision applies according to its terms.

The legislative history of the McCarran-Ferguson Act demonstrates that Congress intended no such amendment. In 1868 the Supreme Court determined that the business of insurance was a matter of purely state concern. *See* Paul v. Virginia, 75 U.S. (8 Wall.) 168, 19 L.Ed. 357. Some 75 years later, however, in United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 the Court reversed itself; it held that the insurance business was commerce and, therefore, subject to the federal antitrust laws. As a result of this ruling, there arose great uncertainty over the constitutionality of state statutes regulating insurance. The McCarran Act was passed in response to this uncertainty.[11]

Congress' intent was to make certain that the states' power to regulate insurance should continue. This is apparent not only in the debates and legislative material accompanying the Act's pas-

---

to protect the policyholders against certain dangers. App. 10.

10. *Baum, supra* note 3, 409 F.2d at 875; Tri-State Broadcasting Co. v. United Press International, Inc., 369 F.2d 268, 270 (5th Cir. 1966).

Plaintiff contend that the issue of whether a transaction's "dominant nature" is tangible or intangible presents a question of fact which cannot be determined on a motion to dismiss. We disagree. Although *Baum* and *Tri-State Broadcasting* did not deal specifically with this argument, it is significant that both cases arose on motions to dismiss.

11. In H.R.Rep.No.143, 79th Cong., 1st Sess. at 2 (1945), the House Judiciary Committee stated:

"Inevitable uncertainties which followed the handing down of the decision in the *Southeastern Underwriters Association case,*

with respect to the constitutionality of State laws, have raised questions in the minds of insurance executives, State insurance officials, and others as to the validity of State tax laws as well as State regulatory provisions thus making desirable legislation by the Congress to stabilize the general situation.

"Bills attempting to deal with the problem were considered in both the House and the Senate during the Seventy-eighth Congress, but failed of enactment. Your committee believes there is urgent need for an immediate expression of policy by the Congress with respect to the continued regulation of the business of insurance by the respective States. Already many insurance companies have refused, while others have theatened refusal to comply with State tax laws, as well as with other State regulations, on the ground that to do so, when such laws

sage,[12] but in the language of the Act itself.[13] As Justice Rutledge, speaking for the Court in Prudential Insurance Co. v. Benjamin, 328 U.S. 408, 66 S.Ct. 1142, 90 L.Ed. 1342 noted:

"Obviously Congress' purpose was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance. This was done in two ways. One was by removing obstructions which might be thought to flow from its own power, whether dormant or exercised, except as otherwise expressly provided in the Act itself or in future legislation. The other was by declaring expressly and affirmatively that continued state regulation and taxation of this business is in the public interest and that the business and all who engage in it 'shall be subject to' the laws of the several states in these respects."

328 U.S. at 429–430, 66 S.Ct. at 1155 (footnote omitted).

While Congress' concern with ensuring the states' power is clear from the Act's legislative history, there is nothing in that history indicating any intent to expand federal power. The legislators correctly recognized that the Supreme Court, in *South-Eastern*, broadened the coverage of the federal antitrust laws. Thus, they were concerned only with making certain that, insofar as these laws already were applicable as a result of the *South-Eastern* decision, they should not be construed as invalidating or displacing state laws.[14]

---

may subsequently be held unconstitutional in keeping with the precedent-smashing decision in the *Southeastern Underwriters case*, will subject insurance executives to both civil and criminal actions for misappropriation of company funds."
The same sentiments were expressed by the Senate Judiciary Committee in S.Rep.No.20, 79th Cong., 1st Sess. at 1–2 (1945).

12. Both the Senate and House Judiciary Committees reported:
"The purpose of the bill is twofold: (1) To declare that the continued regulation and taxation by the several States of the business of insurance is in the public interest; and (2) to assure a more adequate regulation of this business in the States by suspending the application of the Sherman and Clayton Acts for approximately two sessions of the State legislatures, so that the States and the Congress may consider legislation during that period."
S.Rep.No.20, *supra* note 11, at 2; H.R.Rep. No. 143, *supra* note 11, at 3. Representative, later FTC Chairman, Gwynne, similarly remarked during the floor debates that the bill "starts out with the statement that insurance shall be subject to State control. The Congress, of course, cannot delegate to the States the power to regulate insurance. What we are trying to do is to make it clear to the States and to the insurance companies that we are as far as possible removing ourselves from the field."
91 Cong.Rec. 1090 (1945).

13. Section 1 of the Act, 15 U.S.C. § 1011, provides:
"§ 1011. Declaration of policy.

Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States."
Section 2(a), 15 U.S.C. § 1012(a), provides:
"(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business."
Immediately prior to the proviso upon which plaintiffs rely, § 2(b) provides:
"(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance . . . ."

14. The McCarran Act refers specifically to only four laws, *i. e.*, the Sherman Act, the Clayton Act, the Federal Trade Commission Act and the Robinson-Patman Act. *See* 15 U.S.C. §§ 1012(b), 1013(a). Senator O'Mahoney, who had drafted a bill similar to the McCarran Act and served as a manager of the Senate in connection with this Act, stated:
"In drafting those two bills we sought to spell out each particular law which *might apply* to insurance. . . . In other words, a good-faith attempt was made to specify every single law which had an application, or *might have* an application, to insurance."
91 Cong.Rec. 483 (1945) (emphasis added).

Plaintiffs note that, when the Senate initially passed what is now the McCarran-Ferguson Act, it provided in part that nothing in the Robinson-Patman Act "shall apply to the business of insurance or to acts in the conduct of that business." *See* 91 Cong.Rec. 488 (1945). The ultimate rejection of this provision is, according to plaintiffs, persuasive evidence of Congress' intent to make the Robinson-Patman Act, and therefore § 2(c), applicable to insurance.

Congress' action does not, in our opinion, admit of that interpretation. Indeed, it is likely that some legislators withdrew support for the provision because they recognized that it was unnecessary since insurance was not covered by the Robinson-Patman Act; [15] others, erroneously believing that insurance was covered, were unwilling to change the Act so as to exempt the insurance industry. [16] There is, however, nothing in the legislative history to suggest that any legislator thought he was broadening the coverage of the Robin-son-Patman Act by rejecting an amendment which would expressly exempt the insurance industry from its coverage. The net result of the elimination of the provision was merely to permit the impact of the Robinson-Patman Act on the insurance industry to be unaffected, one way or another, by the enactment of the McCarran-Ferguson Act.

 Before a court will find that Congress has amended a statute, there must be clear evidence of an intent to do so. *See* United States v. Welden, 377 U.S. 95, 84 S.Ct. 1082, 1087, 12 L.Ed.2d 152, 103 n. 12 ("Amendments by implication . . . are not favored"). In this case, there is nothing in the language or legislative history [17] of the McCarran-Ferguson Act which indicates that Congress intended to enlarge the scope of the Clayton Act; and, since the clear purpose of the Act was to protect the states' power of regulating insurance, such an intent can hardly be presumed. Consequently, plaintiffs' construction of § 2(b) is untenable. [18]

---

15. Referring to this provision, Senator Ferguson explained:
"We were able to single out and to indicate that we had in mind three acts of which we wanted to make exceptions, because they did not relate to insurance."
91 Cong.Rec. 481 (1945). Representative Gwynne stated that this provision
"is not necessary in the bill, but it was inserted, I suppose, to make it clear that the Federal Trade Commission Act should not apply to insurance and that the Robinson-Patman Act should not apply to insurance. The reason is this: The Robinson-Patman Act was passed with the intent that it should regulate and control the sale of commodities. It was not meant to cover insurance any more than it was meant to cover the banking business. If the Members wish a bill of the character of the Robinson-Patman Act to cover insurance, then I submit a special bill should be introduced which should cover it more equitably and more accurately than the Robinson-Patman Act, which was not written with insurance in mind."
91 Cong.Rec. 1090 (1945).

16. For example, Representative Hancock, who was a member of the Conference Committee which recommended rejection of this provision, stated during the floor debates:

"The decision [in *South-Eastern*] makes insurance interstate commerce, and therefore subject to all the statutes we have enacted dealing with interstate commerce. There are four, I believe: The Federal Trade Commission Act, The Patman Antidiscrimination Act, the Clayton Act, and the Sherman Act."
91 Cong.Rec. 1087 (1945).

17. Plaintiffs argue that § 2(b) is clear on its face and, therefore, there is no need to resort to legislative history. This contention was effectively answered by the Supreme Court in Harrison v. Northern Trust Co., 317 U.S. 476, 479, 63 S.Ct. 361, 363, 87 L.Ed. 407:
"But words are inexact tools at best, and for that reason there is wisely no rule of law forbidding resort to explanatory legislative history no matter how 'clear the words may appear on "superficial examination." ' "
Moreover, § 2(b) must be considered in light of the other provisions of the McCarran Act. See authority cited in 2A Sutherland, Statutory Construction § 46.05 (4th ed. C. Sands ed. 1973). Given the congressional purpose apparent in these provisions, the language in § 2(b) is by no means as clear as plaintiffs suggest.

18. That Congress intended the Clayton Act to apply only to the extent that it applied prior

## IV.

■ Plaintiffs' final contention, that CT&T .is collaterally estopped by the judgment in United States v. Chicago Title & Trust Co., 242 F.Supp. 56 (N.D. Ill.1965), from denying that § 2(c) applies to title insurance, also is without merit. In *Chicago Title* the court determined only that § 7 of the Clayton Act applies to the title insurance business. Since the prohibition of § 7, unlike that of § 2(c), is not limited to "goods, wares, or merchandise," the *Chicago Title* decision cannot have the estoppel effect for which plaintiffs contend.

In conclusion, it should be noted that our decision in this appeal is simply that § 2(c) of the Clayton Act, as amended by the Robinson-Patman Act, has no applicability where the "product" involved is title insurance. We, of course, express no opinion on the propriety of the rebate practices described in the complaint and, specifically, on whether such practices might be prohibited by other state or federal laws.[19]

The judgment of the district court dismissing plaintiffs' complaint for failure to state a cause of action is

Affirmed.

to the *South-Eastern* decision is apparent from the remarks of several congressmen. Senator McCarran, for example, stated with reference to § 2(b) :

"Under the provisions of the section in the conference report to which the Senator addresses himself, the States are advised and warned that they have a moratorium of 3 years during which they may bring themselves into compliance by way of regulation. If at the end of the 3 years they have not brought themselves into compliance, if they have not regulated the business of insurance, then they must take the consequences because after that period is over the Sherman Act and the Clayton Act and the other acts become immediately *again* in force as

regards the business of insurance. That is all there is to that provision."

91 Cong.Rec. 1478 (1945) (emphasis added). *See also* 91 Cong.Rec. 1442 (1945) (remarks of Senator Murdock) ; 91 Cong.Rec. 1482 Cong.Rec. 1482 (1945) (remarks of Senator Pepper).

19. It should be noted that the problem specifically involved in this case may be solved by Congress. *See* The Real Estate Settlement Procedures Act of 1974, which has been approved in slightly different versions by both the Senate and House of Representatives. *See* 120 Cong.Rec.S 13,388 (daily ed. July 24, 1974) ; 120 Cong.Rec.H 8,343 daily ed. Aug. 14, 1974). The bills are now in conference.