**FIRST COMICS, INC., Plaintiff–Appellant and Cross–Appellee,**

v.

**WORLD COLOR PRESS, INC., Defendant–Appellee and Cross–Appellant.**

**Nos. 88–2731, 88–2745.**

United States Court of Appeals, Seventh Circuit.

Argued June 12, 1989.

Decided Sept. 19, 1989.

---

Myron M. Cherry, Cherry & Flynn and Kenneth F. Levin, Chicago, Ill., for First Comics, Inc., plaintiff-appellant.

Edwin D. Akers, Jr., Gallop, Johnson & Neuman, St. Louis, Mo., Michael D. Freeborn, Freeborn & Peters, William C. Holmes, Chicago, Ill., for World Color Press, Inc., defendant-appellee.

Before BAUER, CUMMINGS and FLAUM, Circuit Judges.

CUMMINGS, Circuit Judge.

Plaintiff First Comics, Inc. is a small Chicago-based enterprise that began seriously exploring entrance into comic-book publishing in February 1982. By June, First Comics had decided to proceed with plans to publish comic books and began negotiations with defendant World Color Press, Inc., a comic book printer. At this time, World Color Press was allegedly the only printer to use the letterpress method,[1] a less expensive process of printing comic books. As the largest comic book printer its customers included the largest publishers in the field, notably Marvel Comics Group and DC Comics. During the negotiations with World Color Press, First Comics apparently secured a promise that First Comics would receive the same price and treatment as enjoyed by the larger comic book publishers. Some time in August, First Comics agreed to have its comics printed at World Color Press.

World Color Press failed to live up to its promise to provide the same price and treatment to First Comics as it provided to its larger customers. First Comics, under the impression that the prices it was being charged were the same as the larger publishers that it was competing against, was actually being charged an average of 11.1 cents per copy, or 4.3 cents more per copy than Marvel Comics.[2] First Comics discovered the differing charges in January 1984 and demanded to be recompensed by World Color Press through refund or future credit. World Color Press refused, and in response First Comics switched to another printer, one that used the more expensive offset process since no other letterpress printer could be found.

First Comics then filed this suit, alleging that World Color Press violated the Robinson–Patman Act, 15 U.S.C. § 13(a), and

---

1. First Comics claims that World Color Press is the only printer to use the letterpress method, while Judge Duff, in his memorandum opinion of June 16, 1988, referred to other comic book printers, but did not specify whether these other printers also employed the letterpress method.

2. These figures are according to First Comics' damage expert.

alleging pendent state claims for violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill.Rev.Stat. ch. 121½, § 261, *et seq.*, and common law fraud. The case, originally assigned to Judge Bua, was transferred to Judge Duff, who presided over the nineteen-day jury trial. The jury ultimately found for World Color Press on the Robinson–Patman and Illinois statutory claims, but found for First Comics on the fraud claim and assessed damages in the amount of $407,072. Judge Duff later reduced the damages award by $236,705.

### A. Robinson–Patman Act

Section 2(a) of the Robinson–Patman Act, 15 U.S.C. § 13(a), makes it "unlawful for any person ... to discriminate in price between different purchasers of commodities...." As a jurisdictional matter, the Robinson–Patman Act only protects purchasers from discriminatory pricing of commodities. But what are commodities, and what happens when a challenged pricing scheme involves commodities and non-commodities? Unfortunately, the Act fails to answer these questions.

In *Columbia Broadcasting System v. Amana Refrigeration, Inc.*, 295 F.2d 375, 378 (7th Cir.1961), certiorari denied, 369 U.S. 812, 82 S.Ct. 689, 7 L.Ed.2d 612 (1962), this Court, borrowing from § 3 of the Clayton Act (15 U.S.C. § 14), defined the term commodities as "goods, wares, merchandise, machinery or supplies." Other courts have similarly tried to separate commodities from intangible goods or services.

See, *e.g.*, *Tri–State Broadcasting Co. v. United Press Int'l*, 369 F.2d 268, 270 n. 2 (5th Cir.1966) (distinguishing between tangible and intangible goods; news information); *City of Gainesville v. Florida Power & Light*, 488 F.Supp. 1258, 1281 (S.D.Fla.1980) (tangible and intangible goods; electricity); see also W. Patman, Complete Guide to the Robinson–Patman Act 33 (1963) (the Act covers pricing for "any movable or tangible thing").[3]

■ Because of the functional overlap, the distinction between goods and services is not always clear. Many transactions are of a hybrid nature, contemplating both goods and services; even the transfer of an intangible or service can rarely be accomplished without the incidental involvement of documents or other tangibles. To distinguish between goods and services the dominant nature of the transaction governs whether the activity is subject to the Act.[4] See Rowe, Price Discrimination Under the Robinson–Patman Act 60–61 (1962) ("price quotations fusing physical elements with *dominant* intangible factors cannot beget price discrimination in commodity sales") (emphasis in original); *Freeman v. Chicago Title & Trust Co.*, 505 F.2d 527, 531 (7th Cir.1974). In *Freeman*, the plaintiffs argued that as purchasers of title insurance, they were primarily interested in the title search report, a physical document, and not the underlying search or insurance. This Court rejected that argument, noting that "the reports, like legal memoranda, are merely the embodiment of that service. Clearly, it is the performance of this ser-

---

**3.** The Federal Trade Commission, however, has argued for an analysis that accounts for the practical effects of the challenged activity in light of the purpose and structure of the Act, "rather than becoming preoccupied with metaphysical considerations about what is or is not a tangible product." *In the Matter of the Times Mirror Co.*, 92 F.T.C. 230, 233 (1978) (which held that newspaper advertising is within the ambit of Robinson–Patman; the case was later settled and dismissed). See also 3 E. Kintner & J. Bauer, Federal Antitrust Law: The Robinson–Patman Act 233 (1983) (discussing *Times Mirror*). But see Rowe, Price Discrimination Under the Robinson–Patman Act 61–62 (1962) (arguing in favor of the Commission's earlier opinion that newspaper advertising is not within Act and citing statutory history limiting Act to goods); Von

Kalinowski, 4 Antitrust Laws and Trade Regulation § 24.05 (1988 ed.) (collecting authorities).

**4.** The dominant nature examination was first undertaken by the Sixth Circuit in *General Shale Products v. Struck Construction Co.*, 132 F.2d 425 (6th Cir.1942), certiorari denied, 318 U.S. 780, 63 S.Ct. 857, 87 L.Ed. 1148 (1943). In *Shale*, the Sixth Circuit determined that a construction contract did not include a sale of commodities within the meaning of the Robinson–Patman Act even though the contract listed separately the cost of the bricks and other tangible items to be supplied. See *May Department Store v. Graphic Process Co.*, 637 F.2d 1211, 1215 (9th Cir.1980).

vice and not the delivery of the physical document which constitutes the dominant nature of the transaction...." *Id.; Baum v. Investors Diversified Services, Inc.*, 409 F.2d 872, 875 (7th Cir.1969) (mutual fund shares not commodities); see also *Columbia Broadcasting System v. Amana Refrigeration, Inc.*, 295 F.2d 375 (7th Cir. 1961), certiorari denied, 369 U.S. 812, 82 S.Ct. 689, 7 L.Ed.2d 612 (1962) (sale of television advertising is a service); *Tri-State Broadcasting Co. v. United Press Int'l*, 369 F.2d 268 (5th Cir.1966) (news information provided by teletype is a service); *Aviation Specialties, Inc. v. United Technologies, Corp.*, 568 F.2d 1186 (5th Cir.1978) (discrimination in sale prices for aircraft parts arising from repair contract not actionable because dominant nature of transaction was for repair work); *Ideal Plumbing Co. v. Benco, Inc.*, 382 F.Supp. 1161 (W.D.Ark.1974), affirmed, 529 F.2d 972 (8th Cir.1976) (discrimination in the sale price of components used in construction contract not actionable under the Act because dominant nature of contract was for construction service); *Kennedy Theater Ticket Serv. v. Ticketron, Inc.*, 342 F.Supp. 922 (E.D.Pa.1972) (admission ticket to theater not commodity, but rather incidental to license for admission); *Lubbock Glass & Mirror Co. v. Pittsburgh Plate Glass Co.*, 313 F.Supp. 1184 (N.D.Tex.1970) (contract for glazing a service even though glass, doors and windows supplied).

The parties do not dispute that comic books are commodities within the meaning of the Act. See, *e.g.*, *The Morning Pioneer, Inc. v. The Bismarck Tribune Co.*, 493 F.2d 383 (8th Cir.1974), certiorari denied, 419 U.S. 836, 95 S.Ct. 64, 42 L.Ed.2d 63 (1974) (newspapers are commodities); *Reid v. Harper & Brothers*, 235 F.2d 420 (2d Cir.1956) (books are commodities); *In the Matter of Doubleday & Co.*, 52 F.T.C. 169 (1955) (books are commodities). And while First Comics and World Color Press agree on the facts of the transaction between them, they dispute the nature of the transaction. Both parties agree that during their relationship First Comics developed an illustrated story and sent it to a company that produces a color separation.

The color separation was then sent to World Color Press, which would print the comic books from the separation, supplying the paper, ink, staples and labor. World Color Press then delivered the comic books on First Comics' behalf to retail vendors. The color separation, as well as the copyright for the comic books, remained the property of First Comics. First Comics claims that by these transactions it purchased finished comic books from World Color Press. In contrast World Color Press argues that it did not sell anything to First Comics, but rather merely performed the service of printing for a fee.

*SCM Corp. v. Xerox Corp.*, 394 F.Supp. 384 (D.Conn.1975), and *May Dep't Store v. Graphic Process Co.*, 637 F.2d 1211 (9th Cir.1980), addressed issues similar to the one before us, but neither case finally decided the matter. The plaintiff in *SCM* leased a copying machine from Xerox. The lease price was determined by the number of copies made; thus the plaintiff claimed that the dominant nature of the transaction was a sale of copies. The court ultimately determined that the transaction was actually a sale of the copying process, not a commodity, primarily because the plaintiff purchased the paper on which the copies were made independently of the copier. In a footnote, that court virtually predicted our situation here:

> Where the customer acquires both the paper and the images upon it, as when a photographer sends his negatives to be printed, a closer question arises as to whether the customer has purchased the process of enlarging or enlarged prints that could be considered commodities.

394 F.Supp. at 386 n. 1.

In *May Dep't Store*, the Ninth Circuit heard an appeal from a grant of summary judgment on a Robinson–Patman claim. The plaintiff in *May Dep't Store* alleged that the defendant discriminated in the pricing of veloxes, a type of printing medium in which original artwork is transformed into a series of dots and then used to reproduce the artwork in newspapers. The court recognized the similarity to the "[*SCM*] trial court's analogy ... [that]

must now be addressed." 637 F.2d at 1211. While the court majority addressed the issue, it unfortunately did not decide the matter, but rather determined that the question involved issues of fact that should have precluded summary judgment.[5]

The transaction between First Comics and World Color Press included aspects of a sale of both services and commodities. No doubt one could dissect any service arrangement and find tangible results akin to commodities. Likewise, one could label each level of any manufacturing process as a service with incidental tangible results. But, constrained as we are to identify this transaction as either one or the other, we have little difficulty in concluding that the dominant nature of the transaction was one for services. World Color Press is a printer; it is hired to transpose images from one surface to another. First Comics, like any other publisher, purchases the process of printing from a printer like World Color Press.

First Comics argues that because the end result produces comic books, which are of course tangible objects, and the comic books are then transferred to First Comics, the transaction should be characterized as the manufacture and sale of comic books. This argument is not without some persuasion since World Color Press supplies the generic raw materials, viz., the paper, ink and staples, and arguably no commodities exist at the start of the printing process while at the finish thousands of comic books are ready to be sold. But what was First Comics buying? It was not buying the comics themselves—First Comics' artists and authors produce the comics. And it was not merely buying the paper and ink. The tangible items provided by World Color Press, the paper, ink and staples, are uniformly fungible and not subject to significant price differentials among printers. Rather, as First Comics argues in its brief, World Color Press is "the only [printer] using the less costly 'letterpress' method" (Br. 3)—and that is what First Comics was purchasing, the letterpress method and process of transposing and multiplying images. As explained in Rowe, *supra*, at 60–61, price quotations fusing physical elements with dominant intangible factors do not beget price discrimination within the Act.

The singularly most important ingredient, the color separations, were provided by First Comics. Defendant was in essence multiplying what First Comics already produced. Borrowing from *Advanced Office Systems v. Accounting Systems Co.*, 442 F.Supp. 418, 423 (D.S.C.1977) (preparation of billing statements is a service), at the printing stage the comic books lack real value to any entity other than First Comics. World Color Press cannot sell the finished comic books to any other buyer since First Comics holds the copyright, nor would any of World Color Press' other clients be interested in finished comic books bearing a First Comics story—rather each client wants only the printed version of its own comic book.[6]

---

**5.** The court listed as significant the fact that May did not provide Graphic with any tangible ingredients. The intangible ingredient, artwork, is returned to May with a tangible product, a velox. Graphic has not produced any comparison between the cost of the physical components of a velox and the price charged May. There is no evidence that Graphic billed May separately for labor. We find, therefore, that summary judgment was improperly granted. We do not hold, however, that the transactions involved in this dispute were sales of goods. The plaintiff has the burden of proving this element at trial. 637 F.2d at 1216. Although factual findings may clarify the matter, we are unconvinced that the entire issue—whether the transaction was a sale of commodities—properly belongs before a trier of fact. Rather it is for the court to decide if a given transaction is within the meaning of a statutory term. See *Freeman,* 505 F.2d at 531 n. 10.

Judge Skopil dissented from the decision to reverse summary judgment, observing that "Graphic does nothing more than transform May's artwork into an almost identical image. The production of a tangible item is only incidental to the service provided by Graphic." *Id.* at 1217.

**6.** This also relates to the Robinson–Patman Act's requirement that the commodities sold be of like grade and quality. Since the finished First Comics comic books are of no use to any other publisher, it is a tenuous suggestion that printed comic books, such as Marvel and First Comics comic books, are of like grade and quality sim-

The finished comic books are certainly not insignificant with respect to the process of printing. But the requisite inquiry is to ascertain whether the resulting tangible goods were incidental to a service or the crux of the transaction. Here the comic books were significant, yet they were nonetheless the result of the service of printing. The transaction was for printing even though it involved the purchase of supplies, just as theater tickets are incidental to the intangible right to see a performance, *Kennedy Theater Ticket Serv., supra,* or bricks are incidentally purchased to satisfy a construction contract, *Shale, supra.*

This result does not conflict with earlier decisions holding that newspapers and books are commodities, because in those cases the defendants were the publishers. There the publishers were sued for discriminatory pricing schemes for identical books and identical newspapers sold to different retailers and consumers. The publishers were indeed selling commodities, the predominant nature of the transactions was between the publishers and their customers and involved sales of identical products. Here the transaction was for printing, a service which made possible the production of commodities for future sales by plaintiff. The Robinson–Patman Act was therefore inapplicable.

B. Illinois Consumer Fraud and Deceptive Business Practices Act

1. Consumer Injury Requirement

First Comics also appeals the district court's ruling that consumer injury is an independent element of its pendent state claim brought under the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill.Rev.Stat. ch. 121½, ¶ 261 *et seq.* The district court originally granted summary judgment to World Color Press due

to First Comics' failure to plead consumer injury specifically. The court later reinstated the claim, but still instructed the jury that in order for First Comics to prevail on its claim, it must have proved that World Color Press' pricing had an injurious impact on consumers generally, and not simply on First Comics.

As a federal court hearing a state law claim,[7] the district court and this Court are obliged to follow the decisions of the Illinois Supreme Court, or if that court has yet to offer its opinion on a matter, then the federal courts are to decide the case in the manner the state high court would likely decide it. In the absence of an Illinois Supreme Court decision on the matter, intermediate appellate state court decisions are the guideposts, unless there are other persuasive data that the state supreme court would decide the matter differently. *Peeler v. Village of Kingston Mines,* 862 F.2d 135 (7th Cir.1988), citing *Hicks v. Feiock,* 485 U.S. 624, 108 S.Ct. 1423, 1428–1429 n. 3, 99 L.Ed.2d 721, and *Commissioner v. Estate of Bosch,* 387 U.S. 456, 464–465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886.

The Illinois Supreme Court has yet to rule whether the Consumer Fraud Act requires proof of public injury or some general effect on consumers broadly in order to recover under the Act, and the intermediate state appellate courts are in some disagreement on the matter, as are the district courts within this Circuit. Indeed only recently this Court was faced with the issue in *Graphic Sales, Inc. v. Sperry Univac Div.,* 824 F.2d 576 (7th Cir.1987), but avoided its resolution because the case was decided on other grounds. This time we cannot avoid the fray.

▇ The Consumer Fraud Act provides that:

tion, Commerce and Exemptions; Sales, Commodities and Like Grade and Quality Requirements, 53 Antitrust L.J. 847, 860 n. 31 (1985).

ply because they are printed to the same specifications. See 3 E. Kintner & J. Bauer, Federal Antitrust Law: Robinson–Patman Act 231–232 (1983) ("it makes sense to focus principally on the *perception of the ultimate consumer* ... if consumers view the products as being dissimilar, and prefer one or the other even if the prices are equal, then Robinson–Patman ought to play no role") (emphasis in original); Vawter, Jurisdic-

7. Since a substantial federal question was presented by this case and a great many judicial resources have already been expended, jurisdiction is proper under pendent jurisdiction.

Unfair methods of competition and unfair or deceptive acts or practices, * * * are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

Ill.Rev.Stat. ch. 121½, ¶ 262. The Act authorizes a private right of action by providing:

Any person who suffers damage as a result of a violation of this Act committed by any other person may bring an action against such person.

Ill.Rev.Stat. ch. 121½, ¶ 270a. At first blush, the Act seemingly does not require that consumer or public injury need be proved to prevail under the Act. Nonetheless both the state and federal courts have split on the matter, although the balance seems to require such an injury. Compare *Jays Foods, Inc. v. Frito–Lay, Inc.*, 664 F.Supp. 364 (N.D.Ill.1987) (requiring consumer injury); *Maduff v. Life Ins. Co. of Virginia*, 657 F.Supp. 437 (N.D.Ill. 1987) (requiring consumer injury); *Horsell Graphic Industries v. Valuation Counselors, Inc.*, 639 F.Supp. 1117 (N.D.Ill.1986) (requiring consumer injury); *Heritage Ins. Co. v. First National Bank of Cicero*, 629 F.Supp. 1412 (N.D.Ill.1986) (requiring consumer injury); *UNR Industries, Inc. v. Continental Ins. Co.*, 623 F.Supp. 1319 (N.D.Ill.1985) (requiring consumer injury); *Newman–Green, Inc. v. Alfonzo–Larrain*, 590 F.Supp. 1083 (N.D.Ill.1984) (requiring consumer injury); *Feldstein v. Guinan*, 148 Ill.App.3d 610, 101 Ill.Dec. 947, 499 N.E.2d 535 (1st Dist.1986) (requiring consumer injury); *McCarter v. State Farm Mutual Automobile Ins.*, 130 Ill.App.3d 97, 85 Ill.Dec. 416, 473 N.E.2d 1015 (3d Dist. 1985) (requiring consumer injury); *Frahm v. Urkovich*, 113 Ill.App.3d 580, 69 Ill.Dec. 572, 447 N.E.2d 1007 (1st Dist.1983) (requiring consumer injury); with *Hometown Savings & Loan Ass'n v. Moseley Securities Corp.*, 703 F.Supp. 723 (N.D.Ill.1988) (not requiring consumer injury); *Haroco, Inc. v. American Nat'l Bank & Trust Co.*, 647 F.Supp. 1026 (N.D.Ill.1986) (not requiring consumer injury); *Duncavage v. Allen*, 147 Ill.App.3d 88, 100 Ill.Dec. 455, 497 N.E.2d 433 (1st Dist.1986) (not requiring consumer injury); *Tague v. Molitor Motor Co.*, 139 Ill.App.3d 313, 93 Ill.Dec. 769, 487 N.E.2d 436 (5th Dist.1985) (not requiring consumer injury); *M & W Gear Co. v. AW Dynamometer, Inc.*, 97 Ill.App.3d 904, 53 Ill.Dec. 721, 424 N.E.2d 356 (4th Dist.1981) (not requiring consumer injury); *Beard v. Gress*, 90 Ill.App.3d 622, 46 Ill.Dec. 8, 413 N.E.2d 448 (4th Dist.1980) (not requiring consumer injury).

Besides having the weight of the cases on its side, that line of reasoning requiring a showing of consumer injury is the more persuasive and therefore most likely to be adopted by the Illinois Supreme Court. Without such a limitation, the Act would not simply be extremely far-reaching but would likely supplant many common law breach of contract and fraud cases, something the Illinois legislature surely did not intend. See *Maduff*, 657 F.Supp. at 440; *Exchange National Bank v. Farm Bureau Life Ins.*, 108 Ill.App.3d 212, 63 Ill. Dec. 884, 438 N.E.2d 1247 (3d Dist.1982).

Moreover a complete reading of the Act supports the conclusion that its aim was to protect consumers. Paragraph 262, which broadly forbids unfair methods and deceptive practices, directs "consideration … to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act," 15 U.S.C. § 45, its federal counterpart. Under Section 5(a) of the Federal Trade Commission Act, a charge alleging an unfair or deceptive practice must contemplate protection of the public. See *Spiegel, Inc. v. Federal Trade Comm'n*, 494 F.2d 59, 62 (7th Cir.1974), certiorari denied, 419 U.S. 896, 95 S.Ct. 175, 42 L.Ed.2d 140 (1974), citing *Federal Trade Comm'n v. Klesner*, 280 U.S. 19, 27, 50 S.Ct. 1, 3, 74 L.Ed. 138. The succeeding paragraphs of the Consumer Fraud Act essentially compare a laundry list of specific instances in which the Act would apply—all of which necessarily implicate consumer concerns, *e.g.*, ¶ 262A (pyramid sales

schemes); ¶ 262B (consumer sales contracts); ¶ 262C (consumer credit); ¶ 262D (installment sales); ¶ 262J (advertising); ¶ 262J.1 (coupons); ¶ 262P (offers of prizes); ¶ 262Q (home improvements). And though some courts have expressed an unwillingness to construe the consumer injury requirement absent explicit legislative dictate, see *Haroco*, 647 F.Supp. at 1026; *Hometown Savings & Loan*, 703 F.Supp. at 727, citing *Sedima, S.P.R.L. v. Imrex*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346, the Act must not be read in a vacuum. While the judiciary should not abuse its authority by correcting a legislative mistake, *Sedima, supra*, it should not interpret legislation in such a microscopic fashion as to blur the context.

As noted, the Illinois Supreme Court has not squarely addressed this issue, but has indicated that the reach of the Act is limited to conduct which deceives or exploits consumers. See *Scott v. Ass'n for Childbirth at Home*, 88 Ill.2d 279, 285, 58 Ill. Dec. 761, 430 N.E.2d 1012 (1981) (Act applies to advertising and sale of educational and training services because "purchasers of educational services may be in as much need of protection against unfair or deceptive practices in their advertising and sale as are purchasers of any other service"); *Steinberg v. Chicago Medical School*, 69 Ill.2d 320, 328, 13 Ill.Dec. 699, 371 N.E.2d 634 (1977) (rejected medical school applicants cannot sue under the Act because they are not consumers).[8] These pronouncements indicate an intention on the part of the Illinois Supreme Court to look beyond the effect of the immediate scheme on the putative victim to determine whether a class of consumers was affected. Consequently, consistent with the Act, it was incumbent upon First Comics to show that World Color Press' "misconduct injured consumers generally." *Jays Foods*, 664 F.Supp. at 369.

### 2. Failure to Show Consumer Injury

Under the Illinois Act First Comics had the burden of proving that consumers generally were injured in some way by World Color Press' misconduct. Consumer injury can take two forms: direct injury to the consumers or indirect through stifled competition. First Comics claims that World Color Press' pricing scheme stifled competition by promoting retail price disparities between First Comics comic books and those of the favored publishers, primarily Marvel Comics Group, DC Comics and Archie, another comic book publisher.

First Comics argues, and the jury accepted, that World Color Press charged higher prices for printing services to those publishers in competition with its favored publishers. This does not necessarily mean that competition was stifled in such a way as to injure consumers. See, *e.g., American Oil Co. v. FTC*, 325 F.2d 101, 104 (7th Cir.1963), certiorari denied, 377 U.S. 954, 84 S.Ct. 1631, 12 L.Ed.2d 498 (1964) (price discrimination does not *per se* constitute antitrust violation; plaintiff still must show a lessened ability to compete). First Comics must demonstrate that consumers were affected by the price disparity; it failed to persuade the jury on this issue at trial. The "plaintiffs are not entitled to judgment notwithstanding the verdict ... unless no rational jury could have brought back a verdict for the defendants." *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 678 (7th Cir.1985), certiorari denied, 475 U.S. 1129, 106 S.Ct. 1659, 90 L.Ed.2d 201 (1986) (citations omitted), a more rigorous standard than merely persuading this Court that a different verdict should have been reached.

■ The jury's decision that World Color Press' misconduct did not injure consumers generally is not without rational basis. There was ample evidence for the jury to

---

**8.** Of those cases that did not require consumer injury, most have either involved consumer plaintiffs or conduct from which consumer injury could readily be inferred. *E.g., Haroco, supra* (plaintiffs were commercial borrowers and alleged deceptive activity involved broad segment of bank's activities); *M & W Gear, supra* (consumer injury easily inferred in false advertising suit between competitors); *Duncavage, supra* (tenant was held consumer under Consumer Fraud Act); *Tague, supra* (plaintiff was consumer complaining about misconduct in sale of car); see also *Jays Foods*, 664 F.Supp. at 369; *Newman–Green*, 590 F.Supp. at 1087.

reach that decision. For example, there was evidence before the jury that First Comics set its retail price before even receiving the price quotations from World Color Press. Moreover, the difference between First Comics' one dollar cover price and those of the favored publishers was much higher then the overcharge incurred by First Comics. And when First Comics did receive printing cost reductions, it did not pass these production cost savings on to the consumers, but rather pocketed the savings. This detracts from its argument that lower production costs would have allowed it to compete with the favored publishers' cover price. There was no evidence that First Comics lost sales or customers because of its higher cover price, and in fact one witness testified that the market is made up of collectors unlikely to be deterred by the price differential alleged by First Comics. Finally, there was evidence concerning other comic book publishers—both successful and not, favored and unfavored—which suggested that the price differential did not stifle competition, or result in higher cover prices or consumer injury. In light of the evidence available to the jury, there was a rational basis for its conclusion that competition was not stifled, nor were consumers generally injured.

## C. Damages

First Comics prevailed at trial on its common law fraud claim and was awarded $407,072 in damages by the jury. This award included $236,705 in consequential damages. The consequential damages arose following the discovery of the fraud, when First Comics began using another printer. According to First Comics, which did not have a contract with defendant, the contracts between World Color Press and the favored publishers included a provision which required either side to tender one-year notice for non-renewal of the contract. First Comics argues that this notice provision amounted to a one-year price protection benefit enjoyed by the favored publishers. First Comics contends that if it had received equal treatment as promised by the defendant, it too would have been subject to this provision, which would have meant not only lower charges during the fraudulent period, but also would have guaranteed those lower prices during the one-year period following the fraud. Absent such notice, First Comics contends that its injuries continued accruing for a year even after it secured another printer. Thus the consequential damages figure represents the price differential between what First Comics paid to the later printer over the subsequent year and the price First Comics would have paid to World Color Press had there been no fraud. After the trial Judge Duff, however, reduced First Comics' award by that amount, and First Comics appeals his decision.

Plaintiff argues that fraud damages can accumulate even after the discovery of fraud, citing *Thor Power Tool Co. v. Weintraub*, 791 F.2d 579, 585 (7th Cir.1986), and *Four "S" Alliance v. American Nat'l Bank*, 104 Ill.App.3d 636, 60 Ill.Dec. 314, 432 N.E.2d 1213 (1st Dist.1982). It is true that injuries caused by fraud are not neatly halted by discovery of the fraud. Nevertheless, First Comics was required to show that its claimed consequential damages grew out of the fraud.

While jury awards will not be disturbed unless lacking a rational basis, with all inferences drawn in favor of the nonmoving party, a reduction of the damages award was justified here. There was no basis to justify the jury's award of consequential damages.

World Color Press promised First Comics that it would render treatment equal to that extended to the favored publishers. This was obviously untrue, as evidenced by the higher prices charged for printing services which now comprise First Comics' direct damages award. And First Comics argues that if it had equal treatment it would have had one-year price protection. But equal treatment does not mean identical treatment. The favored publishers were longstanding customers with longstanding contracts and whose business, by First Comics' own estimation, comprised well over half of World Color Press' business. The contracts between World Color Press and the favored publishers were not

simply one-year price protection provisions solely for the publishers' benefit, but rather guaranteed to each party at least one-year notice of nonrenewal. The provision was for World Color Press' benefit as much as the publishers.

In contrast First Comics had yet to publish a single book when the promise of equal treatment was extended. Obviously, neither World Color Press nor First Comics expected a long-term contract at that time. In fact, First Comics never signed a contract with World Color Press; instead, it paid for printing by the job. Thus there was nothing to hold First Comics to World Color Press, nor World Color Press to First Comics. While First Comics no doubt relied on the promise of equal treatment, any sort of price protection to plaintiff would have been more favorable than the treatment extended to the favored publishers because First Comics would enjoy the so-called one-year price protection without the obligation to continue with World Color Press for at least a year. The only rational scope for the term equal treatment would be the price for each job, since that is the context in which the promise was made and upon which plaintiff relied.[9]

■ World Color Press also excepts to the final damage award. At the time of the lawsuit, First Comics had been billed but refused to pay $99,624 in printing charges and freight costs, which prompted World Color Press to counterclaim for this amount. At trial First Comics' damage expert calculated its total damage figure under the mistaken impression that these charges had been paid. World Color Press requested that Judge Duff instruct the jury to deduct this amount from whatever damages amount it might later award First Comics. Judge Duff declined this instruction as well as World Color Press' subsequent motion for judgment on the counterclaim. This was error.

First Comics' direct damages consisted of the fraudulent prices it actually paid less the prices it should have paid absent the fraud. The final damages figure cannot include that sum which was merely billed but not paid, because First Comics certainly has not suffered this loss. The proper resolution is either to exclude the unpaid charges from First Comics' damages determination or to award judgment on World Color Press' counterclaim. Consequently, First Comics is only entitled to those losses it actually incurred.

### D. Conclusion

First Comics is not entitled to judgment on its Robinson–Patman Act claim. As a matter of law, First Comics paid for printing services, not commodities, and therefore the Robinson–Patman Act had no applicability. As for the Illinois Consumer Fraud and Deceptive Business Practices Act, we agree with the district court that the Illinois Supreme Court would likely require that some sort of public or consumer injury be demonstrated in order to recover under that Act. First Comics failed to meet that standard.

Finally, with respect to the damages awarded by the jury on First Comics' common law fraud claim, Judge Duff correctly reduced the award by the amount of higher charges incurred by First Comics in the year following the fraud.[10] There was no rational basis to conclude that First Comics was entitled to a one-year period of price protection. The damage award should have been reduced further by the amount of outstanding charges which plaintiff never paid.

Accordingly, the judgment is affirmed except as to amount of damages. As to that feature the case is remanded for recalculation consistent with this opinion.

---

**9.** First Comics contends, without rebuttal by World Color Press, that Judge Duff included within the $236,705 reduction a claim of $5,370 that the jury had already rejected (Br. 18 n. 12). If true, that $5,370 was not a component of the original damages award as assessed by the jury and should not have been offset. On remand a determination should be made as to whether the $236,705 reduction did indeed include this already rejected claim.

**10.** But see note 9 *supra.*