**INNOMED LABS, LLC, Plaintiff–Counter–Defendant—Appellant,**

v.

**ALZA CORPORATION, Defendant–Counter–Claimant—Appellee,**

**Johnson & Johnson, Defendant.**

**Docket No. 02–9491.**

United States Court of Appeals, Second Circuit.

Argued: Oct. 9, 2003.

Decided: May 14, 2004.

Paul F. Corcoran, Davis & Gilbert, LLP (Jennifer Tafet Klausner and Jennifer L. Schatzman, on the brief), New York, NY, for plaintiff-counter-defendant-appellant.

Harold P. Weinberger, Kramer Levin Naftalis & Frankel LLP (Jennifer L. Rochon, on the brief), New York, NY, for defendant-counter-claimant-appellee.

Before: SOTOMAYOR, and WESLEY, Circuit Judges.*

* The Honorable Jon O. Newman, who was a member of this panel, recused himself following oral argument, and the appeal is being decided by the remaining two members of the

**152**

SOTOMAYOR, Circuit Judge.

Plaintiff-appellant Innomed Labs, LLC ("Innomed") appeals from a judgment of the United States District Court for the Southern District of New York (Baer, J.) following a jury trial. Innomed and defendant-appellee ALZA Corporation ("ALZA") entered into a Distribution and Supply Agreement (the "Distribution Agreement") that gave Innomed the semi-exclusive right to distribute ALZA's patented pharmaceutical products, in return for up-front, royalty, and supply payments. Innomed alleges that ALZA committed price discrimination, in violation of the Robinson–Patman Act, 15 U.S.C. § 13(a), by charging Innomed prices that were higher than those ALZA charged the other semi-exclusive distributor of ALZA's product. Innomed also claims that ALZA's termination of the Distribution Agreement in March 2001 constituted a breach of the agreement's cure provisions, and that the termination tortiously interfered with Innomed's attempt to assign its rights under the agreement to another distributor. The district court dismissed the bulk of Innomed's breach of contract claims and its claim for tortious interference with prospective economic advantage on summary judgment. Following a trial, the jury found against Innomed on its Robinson–Patman Act claim.

On appeal, Innomed contends that two aspects of the district court's jury instructions regarding Innomed's Robinson–Patman Act claim were erroneous, necessitating a new trial. Innomed argues that the court erred in instructing the jury that the Robinson–Patman Act would not apply to the Distribution Agreement if the jury found that the agreement primarily concerned the right to distribute a patented product, and that the court defined the antitrust injury necessary to establish enti-

tlement to treble damages too narrowly. Innomed also challenges the district court's summary judgment dismissal of its claims for breach of contract and tortious interference, arguing that disputed issues of material fact warrant a trial on these claims. We dispose of Innomed's arguments with respect to the summary judgment decision, and its challenges to a number of the district court's discovery and evidentiary rulings, in a summary order issued in conjunction with this opinion, and address only Innomed's challenges to the jury instructions here.

We hold that (1) the court erred in charging the jury that the Robinson–Patman Act would not apply to the Distribution Agreement if the jury determined that the agreement was primarily a contract for the right to distribute a patented product, but this error was not fundamental and does not warrant a new trial; and (2) the court's instruction on the antitrust injury necessary to establish Innomed's entitlement to treble damages was harmless error.

## BACKGROUND

ALZA entered into the Distribution Agreement with Innomed's parent company, Hogil Pharmaceutical Corporation, in 1997. Hogil immediately assigned its rights under the Distribution Agreement to Innomed, an entity Hogil created to perform the contract. Under the terms of the Distribution Agreement, Innomed was to be a semi-exclusive distributor of three types of pills containing ALZA's patented timed-release pharmaceutical technology, which Innomed would distribute as a 24–hour cold medicine under one of Hogil's trademarks. ALZA, for its part, would manufacture the pills and supply them to Innomed for distribution.

panel, who are in agreement. *See* 2d Cir. R. § 0.14(2).

The Distribution Agreement obligated Innomed to make three types of payments to ALZA. Innomed was to make an upfront payment of $2 million, and two milestone payments of $1 million each after ALZA's first two deliveries of pills.[2] Innomed was also to purchase certain minimum quantities of the pills from ALZA each quarter, at a supply price of between $.08 and $.095 per pill for each product. Finally, at the end of each quarter, Innomed was to pay to ALZA royalties totaling 5% of Innomed's aggregate net sales for the first $20 million of net sales, and 7.5% of aggregate sales exceeding $20 million.

Innomed subsequently defaulted on several of its scheduled payments, failing to make one of the milestone payments and to pay the supply price for roughly $940,000 worth of pills that it ordered and received. In March 1999, the parties modified the Distribution Agreement to allow Innomed to cure its default by making monthly payments of $50,000, as well as quarterly royalty payments totaling 45% of its net sales. Despite these modifications, Innomed again defaulted, making only $150,000 in monthly payments and failing to pay royalties.

On November 28, 2000, after repeatedly demanding payment, ALZA notified Innomed of its intent to terminate the Distribution Agreement. ALZA invoked § 12.2(c) of the Distribution Agreement, which gave either party the right to terminate the Distribution Agreement "on 60 days' prior written notice to the other party, if such other party is in material breach of this Agreement, and such breach is not cured within 60 days ... after the date after such notice." ALZA's notification of its intent to terminate the contract triggered the sixty-day cure period, giving Innomed until January 28, 2001, to cure its default.

Section 12.2(c) also provided that if the breach was "of a nature such that it cannot be cured within 60 days despite diligent efforts, then such 60 day period shall be extended for a longer period as is reasonably necessary to cure such breach using diligent efforts." Rather than negotiating its entitlement to this provision or making the payments necessary to cure its default, however, Innomed served ALZA with a complaint and moved for a preliminary injunction on January 23, five days before the end of the cure period. On January 24, the parties entered into the first of what would later be termed "standstill agreements." Memorialized in a letter from Innomed's counsel to ALZA's counsel, the standstill agreement provided that ALZA "will not be terminating the agreement ... on January 28, 2001 as was stated in ALZA's [earlier] correspondence on this issue. Instead, ALZA has agreed that it will not terminate the contract before February 11, 2001." Both parties also agreed that they would not institute legal proceedings before February 11.

On January 26, Innomed and ALZA orally agreed on a means by which Innomed could cure its default. Although this agreement ("the January 26 Agreement") was never memorialized in writing, it is undisputed that Innomed's principal, Howard Wendy, represented to ALZA that he "had a deal" with American Home Products ("AHP"), in which Innomed would assign its rights under the Distribution Agreement to AHP, in return for $8 million and a 5% royalty on gross sales. ALZA agreed that Innomed could cure its

---

**2.** The amounts of these payments were determined in an amendment to the Distribution Agreement, executed in December 1997.

default by sharing the proceeds from the assignment with ALZA, but only if Innomed was able to finalize the assignment agreement quickly.

Although Wendy represented to ALZA on January 26 that the AHP assignment agreement was effectively final, contingent only upon AHP's satisfactory conclusion of due diligence, the actual status of the assignment agreement was sharply disputed before the district court. Wendy testified that as of January 26, he believed that the AHP agreement was binding and final in all material respects. In contrast, AHP's vice president, Gregory Bobyock, testified that as of January 26, AHP had not reached agreement with Innomed on any of the principal terms of the assignment. AHP had yet to perform the market research that would determine how much it was willing to pay Innomed in return for the assignment, and the parties therefore had not yet agreed on a price term. Consequently, AHP did not consider itself contractually bound in any way.

Shortly after the ALZA–Innomed standstill agreement expired on February 11, the parties executed another two-week standstill agreement, which was to expire on March 15. Meanwhile, on February 15, Innomed, ALZA, and AHP entered into a confidentiality agreement to facilitate AHP's ability to conduct due diligence with respect to ALZA. In the beginning of March, however, ALZA advised Innomed that it had not yet been contacted by AHP regarding the due diligence, and demanded "a more thorough explanation of what due diligence AHP has undertaken, as well as an update on the status of [Innomed's] discussions with AHP." Although Innomed's response to this request is not memorialized, AHP soon thereafter scheduled a due diligence visit to ALZA for April 2001.

ALZA and Innomed subsequently extended the standstill agreement to March 26. On March 27, ALZA was acquired by Johnson & Johnson ("J & J"), a competitor of AHP in the over-the-counter drug market. Two days later, on March 29, ALZA notified Innomed that it would not extend the standstill agreement further, and that the Distribution Agreement was terminated, effective March 26, 2001. Innomed filed this lawsuit shortly thereafter.

Innomed's initial complaint alleged that (1) ALZA had breached the termination and cure provisions of the Distribution Agreement by terminating the contract on March 26; (2) ALZA had breached the January 26 Agreement by terminating the Distribution Agreement before Innomed had sufficient time to finalize the assignment of the Distribution Agreement to AHP; and (3) ALZA had tortiously interfered with Innomed's prospective business relations with AHP by terminating the Distribution Agreement and leaving Innomed with nothing to assign to AHP. ALZA, in turn, asserted a breach of contract counterclaim against Innomed, seeking damages in the amount of Innomed's default under the Distribution Agreement. In May 2002, Innomed sought and obtained leave to amend its complaint to include a claim for price discrimination in violation of the Robinson–Patman Act, 15 U.S.C. § 13(a). Innomed alleged that although ALZA's agreement with Warner–Lambert, the other semi-exclusive distributor of ALZA's timed-release cold products, involved one of the same products as the ALZA–Innomed Agreement and was comparable to the Distribution Agreement in structure, it contained significantly more favorable price terms than the ALZA–Innomed Agreement. Innomed also amended its complaint to allege that, *inter alia*, ALZA had breached the implied covenants of good faith and fair dealing in the Distribution Agreement and the January 26

Agreement, and had fraudulently induced Innomed's execution of the Distribution Agreement.

In November 2002, the district court dismissed the majority of Innomed's breach of contract claims in response to ALZA's motion for summary judgment. Shortly thereafter, the remainder of Innomed's claims and ALZA's counterclaims were tried before a jury. Before submitting the case to the jury, the court granted a directed verdict in favor of ALZA on Innomed's claim for tortious interference, for reasons not clearly stated on the record. The jury found against Innomed on its Robinson–Patman Act claim and its fraudulent inducement claim. It also found that Innomed had breached the Distribution Agreement, and that it was liable to ALZA for approximately $3 million.

Innomed now appeals.

## DISCUSSION

On appeal, Innomed challenges two of the court's jury instructions with respect to its Robinson–Patman Act claim. Specifically, Innomed contends that the district court erroneously instructed the jury that (1) if the dominant purpose of the Distribution Agreement was to grant Innomed the right to distribute ALZA's patented products, the contract would not be covered by the Robinson–Patman Act; and (2) if ALZA was found to have violated the Robinson–Patman Act, Innomed could recover only for injuries resulting from contract payments it had actually made to ALZA. Although we find that both challenged jury instructions were erroneous, we hold that neither error warrants a new trial.

■■■■ When a challenge to a jury instruction has been preserved for appeal by a timely objection at trial, we review the instruction *de novo*. *See LNC Invs., Inc.*

*v. First Fid. Bank,* 173 F.3d 454, 460 (2d Cir.1999). "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Anderson v. Branen,* 17 F.3d 552, 556 (2d Cir.1994). Where, however, a party has forfeited a challenge to an instruction by failing to object at trial, we review the instruction only for fundamental error. *See Shade v. Hous. Auth. of New Haven,* 251 F.3d 307, 312–13 (2d Cir.2001). An error is fundamental if, in addition to contravening an established rule of law, *see United States v. Parcel of Property,* 337 F.3d 225, 234 (2d Cir.2003), it is "so serious and flagrant that it goes to the very integrity of the trial." *Shade,* 251 F.3d at 313 (internal citation and quotation marks omitted). We may grant a new trial for fundamental error only if the charge "deprived the jury of adequate legal guidance to reach a rational decision," *Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd.,* 930 F.2d 1021, 1026–27 (2d Cir.1991), or completely misled the jury as to the governing law, *see Jin v. Metro. Life Ins. Co.,* 310 F.3d 84, 98–99 (2d Cir.2002).

## I. The "Dominant Nature" Instruction

The Robinson–Patman Act prohibits price discrimination that may have the effect of hindering competition in the marketplace, or inflicting economic or competitive injury on specific market actors. The Act provides that "[i]t shall be unlawful for any person ... either directly or indirectly, to discriminate in price between different purchasers of commodities ... where such commodities are sold for use, consumption, or resale within the United States," and where the effect of the discrimination is anti-competitive. 15 U.S.C. § 13(a). Innomed alleged that ALZA entered into similar semi-exclusive distribution agreements with both Innomed and Warner–Lambert, and that although the

two agreements concerned a common ALZA product, the Warner–Lambert agreement contained significantly lower supply prices, as well as lower milestone and royalty payments, than the Innomed agreement.

█ The Robinson–Patman Act's prohibition on price discrimination extends only to transactions involving "commodities." *Id.* Courts have strictly construed this term, holding that it denotes only "tangible products of trade." *May Dep't Store v. Graphic Process Co.,* 637 F.2d 1211, 1214 (9th Cir.1980) (citing *Baum v. Investors Diversified Servs.,* 409 F.2d 872, 874–75 (7th Cir.1969)); *see also Ambook Enters. v. Time Inc.,* 612 F.2d 604, 609–10 (2d Cir. 1979) (referencing the "strict view of the meaning of the term 'commodities'" taken by other circuits, and holding that sale of retail newspaper advertising was not a transaction involving commodities). When the subject of a contract is a combination of both tangible goods and intangible rights or services, the contract is covered by the Robinson–Patman Act if its "dominant nature" or purpose is the sale of tangible products rather than the transfer of intangible rights or services. *See Tri–State Broad. Co., Inc. v. United Press Int'l, Inc.,* 369 F.2d 268, 270 (5th Cir.1966) (applying dominant nature test to transfer of broadcasting rights, where information to be broadcast was to be transferred in the form of written reports); *see also Ambook,* 612 F.2d at 609 n. 6 (citing cases that employ the dominant nature test).

Because the Distribution Agreement provided not only that Innomed would buy certain quantities of ALZA's pills, but also that Innomed would gain the right to distribute the pills on a semi-exclusive basis, ALZA argued below that the dominant nature of the Distribution Agreement involved the sale of intangible rights, rather than commodities. Specifically, ALZA ar-

gued that the milestone and royalty payments for which Innomed was responsible represented payments for "the right to distribute products using ALZA's patented technology." ALZA correctly refrained from arguing, however, that the fact that the pills contained patented technology meant that they were not commodities within the meaning of the Act. *See, e.g., George Haug Co., Inc. v. Rolls Royce Motor Cars, Inc.,* 148 F.3d 136, 144 (2d Cir. 1998) (applying Robinson–Patman Act to contracts for the sale of car parts). Thus, the thrust of ALZA's argument was that the right to distribute was itself an intangible that could change the dominant nature of the contract, and that the right to distribute constituted a more significant aspect of the contract because the pills contained patented technology.

The district court submitted the issue of the dominant nature of the Distribution Agreement to the jury, instructing it as follows:

> To determine whether the transaction involved the sale of commodities, you must look to the dominant nature of the transaction. If the dominant nature of the transaction involved the sale of commodities or physical goods, the Robinson–Patman Act applies.
>
> If you find the dominant nature of the transaction was the sale of physical goods or commodities, you must find that Innomed has proven this element of its price discrimination claim. If you find the dominant nature of the transaction was the sale of intangible items, such as services or *the right to distribute a patented product,* then you must find for the defendant and against Innomed on the Robinson–Patman claim. Again, the dominant nature of the transaction, that is, what the transaction was primarily directed towards, is pivotal

with respect to this element. Trial Tr. at 774–75 (emphasis added).

Innomed now challenges this instruction, arguing that the italicized language effectively eviscerated the Robinson–Patman Act's protections both with respect to distribution contracts that give a purchaser the exclusive right to redistribute the purchased product, and with respect to distribution contracts involving products that happen to be patented. Thus, Innomed contends, the district court should not have suggested that the inclusion of the semi-exclusive right to distribute in the contract, as well as the patents appended to the pills, could alter the dominant nature of the transaction.

ALZA defends the instruction by arguing that contracts primarily concerned with the right to distribute a product (whether patented or not) are properly excluded from the coverage of the Robinson–Patman Act. Moreover, ALZA argues that even if the inclusion of the distribution right itself is not sufficient to render the contract predominantly intangible in nature, the inclusion of the right to distribute a patented product certainly renders the transaction predominantly concerned with the intangible right to exploit the product and its appended intellectual property. Thus, ALZA argues that the district court was entirely correct to treat the applicability of the Robinson–Patman Act as an issue of fact, and the jury was entitled to find that the Distribution Agreement was intangible in nature if it concluded that the grant to Innomed of the semi-exclusive right to distribute, and the existence of the patents, predominated over the tangible elements of the transaction.

ALZA also contends that Innomed failed to object to the court's charge before it was given, and has therefore not preserved this issue for appellate review. Because we may review the charge for error even if Innomed did not object at trial, we first consider whether the charge was erroneous, and then determine whether such error was serious enough to warrant a new trial under the appropriate standard of review. *See Jin,* 310 F.3d at 94 (stating that, in reviewing a challenge to a jury charge, the court first determines whether the charge was erroneous, and then considers whether the error must be reviewed under the fundamental error standard because the objection was forfeited below).

The district court's charge suggested that if the primary object of the Distribution Agreement was to grant to Innomed the right to distribute a patented product, then intangible rights rather than commodities would be the dominant element of the contract. The instruction thus contained two intertwined implications. First, the instruction suggested that, in a general sense, the exclusive right to re-sell or distribute a tangible commodity (whether or not patented) is an intangible right that can itself predominate over the portions of a contract devoted to the sale of the tangible commodity. Second, the instruction suggested that the fact that the pills at issue had patented elements could render the exclusive right to distribute them predominant in the contract. In other words, Innomed's contract payments may have included the right to exploit the intellectual property appended to the tangible product, and this right could affect the nature of the transaction as a whole. We find that both assertions are incorrect. More fundamentally, an analysis of the charge language and its errors leads to the conclusion that the district court was wrong to instruct the jury that the dominant nature test applies to contracts that include only the right to distribute a patented product on an exclusive basis. Because the exclusive right to distribute a patented product cannot create an issue of fact as to wheth-

er the contract is covered by the Robinson–Patman Act, the court should not have submitted the issue of the Act's coverage to the jury.

The district court's instruction reflects the assumption that when a contract not only transfers a tangible product, but also gives the purchaser the exclusive right to distribute that product, the inclusion of the exclusive right to distribute alters the nature of the contract. Thus, the exclusive right to distribute may predominate over the sale of the product itself, such that it becomes necessary to apply the dominant nature test to determine whether the Act applies. An examination of the evolution of the dominant nature test, however, as well as the contracts to which courts have applied the Robinson–Patman Act and the context in which the Act was passed, indicates that contracts involving both the transfer of a product and the right to distribute that product are, as a matter of law, properly considered commodities contracts.

The dominant nature test was developed in the context of contracts in which tangible and intangible elements were inseparable because they were "fus[ed]" together. *First Comics, Inc. v. World Color Press, Inc.*, 884 F.2d 1033, 1035 (7th Cir.1989) (quoting Frederick M. Rowe, *Price Discrimination Under the Robinson–Patman Act* 60–61 (1962)). In these transactions, either the sale of a product simply facilitates the transfer of an intangible right, or the purchaser receives a finished product that combines the input of both goods and services by the seller. Thus, where a broadcaster purchases the right to broadcast copyrighted information, and the information is transmitted to the broadcaster in the form of "tangible written news reports," the factfinder must determine whether the written reports constitute the dominant element of the contract or whether the reports are simply the "tangible incidents" of an intangible intellectual property right. *See Tri–State Broad.*, 369 F.2d at 269–70; *see also Freeman v. Chicago Title & Trust Co.*, 505 F.2d 527, 530–31 (7th Cir.1974) (finding that transfer of title insurance was not commodities contract, despite use of paper to memorialize insurance rights). Similarly, where a purchaser supplies a seller with artwork and the seller transforms the artwork into another medium through a process that involves the input of both additional tangible goods and labor, the contract's dominant nature is an issue of fact. *See May Dep't Store*, 637 F.2d at 1216; *cf. First Comics*, 884 F.2d 1033, 1037 n. 5 (concluding that comic book publishing transaction predominantly involved services rather than goods, and questioning whether dominant nature should always be decided as a matter of law).

In these transactions, the tangible and the intangible elements are fused because they do not form independent or separate elements of the product that the purchaser buys, or because the two elements cannot be separated within the contract itself. Thus, the parties would not have entered into a contract for raw materials without also contracting for the services involved in making the product, or for the intangible information without providing for its physical embodiment or transfer. *See Gen. Shale Prods. Corp. v. Struck Constr. Co.*, 132 F.2d 425, 428 (6th Cir.1942) (noting that seller would not have sold brick to buyer unless the materials were woven into the larger construction contract). It would therefore make little sense to attempt to parse a contact price for a finished product into separate charges when the parties themselves have agreed that the tangible and intangible elements are but two aspects of the product that is the object of the contract. *See id.* (refusing to separate sale of bricks from the rest of the

construction contract); *Aviation Special-ties, Inc. v. United Techs. Corp.*, 568 F.2d 1186, 1191 (5th Cir.1978) (stating that sale of parts was "woven into" the repair agreement, which also included labor). The question then becomes whether the tangible or intangible element is the true focus of the bargain for which the parties have contracted. *See Tri–State Broad.*, 369 F.2d at 269–70 (holding that United Press's written news reports, provided as a supplement to its broadcast, were incidental to the contract's purpose of allowing Tri–State the right to its news information). The dominant nature test is simply the means by which to determine whether the tangible element is incidental to the intangible object of the contract, or vice versa.

■ In a contract selling a commodity with the appended right to distribute the commodity exclusively, however, the tangible product and the intangible element are not fused together. It is clear that the purchaser has contracted for two separate items: the commodity itself and the exclusive right to distribute that commodity. The question is not what the true nature of the contracted-for item or right is, but whether the inclusion of the distribution right renders the Act inapplicable, despite the fact that the contract involves the transfer of a commodity. Because the tangible and intangible elements of the contract are not intertwined, the dominant nature test, with its emphasis on the buyer's intent in contracting and the actual nature of the object contracted for, has no application in the context of commodity distribution contracts. *Cf. Metro Communications Co. v. Ameritech Mobile Communications Inc.*, 984 F.2d 739, 745 (6th Cir.1993) (stating that the dominant nature

test is applicable only when the purchased goods and services are not separable). Accordingly, no case has ever applied the dominant nature test to a transaction involving the sale of a commodity and the exclusive right to distribute that commodity. *See, e.g., Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, 1271 (3d Cir.1995) (assuming that an exclusive distribution contract for roofing materials was covered by the Act).

■ The inclusion of the exclusive right to distribute in a commodities contract does not remove the contract from the ambit of the Robinson–Patman Act. The object of the contract is to transfer the commodity from the manufacturer to a company that is capable of distributing the product on a wider scale. While some manufacturers and distributors may deem it advantageous to enter into exclusive or semi-exclusive distribution contracts, that fact does not render these contracts materially different from contracts between manufacturers and non-exclusive distributors, which are unquestionably covered by the Act. *See* 15 U.S.C. § 13(a) (prohibiting discrimination "in price between different purchasers of commodities ... for ... resale"). Moreover, the right to distribute is a right that concerns the commodity and the purchaser's exploitation of the commodity itself; the grant of the right does not diminish the fact that the parties have bargained for the transfer of the commodity. Although some portion of the contract payments presumably represents the value of the right to distribute on an exclusive or semi-exclusive basis, this element of the contract does not change the basic object of the contract, because the distribution right would be meaningless without the transfer of the commodity itself.[3]

---

**3.** Before determining whether a contract violates the Act, the factfinder must determine the price of the commodity in question.

Where a distribution contract provides separate payments for the supply of the product and the right to distribute, the factfinder may

Indeed, other circuits have assumed that contracts involving the grant of an exclusive distribution right, in addition to the transfer of the commodity, are covered by the Robinson–Patman Act. Thus, in *City of Kirkwood v. Union Elec. Co.*, 671 F.2d 1173, 1181–82 (8th Cir.1982), the court noted that the City had a semi-exclusive distribution contract with an electricity producer, *see id.* at 1175 n. 2, and then considered whether electricity was a commodity within the meaning of the Act, *see id.* at 1181–82. After concluding that electricity was a commodity, the court remanded for consideration of whether the City had established a prima facie case of price discrimination under the Act. *Id.* at 1182. The fact that the City presumably paid the defendant not only for the electricity itself, but also for the semi-exclusive distribution right, did not alter the court's analysis. *See also, e.g., Vanco Beverages, Inc. v. Falls City Indus.*, 654 F.2d 1224, 1228 (7th Cir.1981) (affirming jury verdict on exclusive distributor's Robinson–Patman Act claim after reviewing the application of the Act to the conduct at issue), *aff'd in relevant part*, 460 U.S. 428, 435–38, 103 S.Ct. 1282, 75 L.Ed.2d 174 (1983); *Hartley & Parker, Inc. v. Florida Beverage Corp.*, 307 F.2d 916, 920–22 (5th Cir.1962) (holding that semi-exclusive distributor had stated Robinson–Patman Act claim against manufacturer and other semi-exclusive distributor). The assumption that the Act applies to exclusive distribution contracts reflects the fact that the existence of the exclusive distribution right does not affect the nature of the commodity transferred and cannot render the subject of the contract predominantly intangible.

█ This view of exclusive distribution contracts is supported by the Act's historical context and Congress's intent in passing the Act. The Robinson–Patman Act was drafted amid fears that the rise of integrated chain stores would overpower the traditional distribution model and its reliance on wholesale distributors and retailers to move products from manufacturers to consumers. Rowe 3–11. Chain stores combined the distributive functions of wholesalers with the local sales of retailers, and were able to move large volumes of commodities by relying on their own independent distribution apparatuses. They often obtained lower prices from manufacturers than did wholesale distributors, enabling them to undersell their more traditional competitors by passing on their savings to consumers. *Id.* at 4. The Robinson–Patman Act was therefore intended to prevent chain stores from obtaining purchasing advantages from producers and to ensure that chain stores' competitive advantages arose purely from the economies inherent in integration. *Id.* at 12–13. Accordingly, the Act's Senate Report stated that the purpose of the legislation was to "preserv[e] ... equal opportunity to all usefully employed in the service of distri-

conclude that only the supply payments represent the price of the product, or it may conclude that any other payments provided in the contract indirectly contribute to, and are therefore part of, the price of the product. Thus, our holding that exclusive distribution contracts are always covered by the Act should not be construed as implying that all payments provided in the contract at issue necessarily should be considered part of the price of the commodity.

Here, for instance, Innomed contends that the royalty and milestone payments should be considered as elements of the price of the pills for purposes of Innomed's Robinson–Patman Act claim. Innomed has not cited authority suggesting that the issue of the price of the pills should have been determined as a matter of law, however, and the district court correctly instructed the jury that it could consider the royalty and milestone payments part of the price of the pills if it determined that the evidence warranted this conclusion.

bution comportably with their ability ... to serve the ... consuming public." S.Rep. No. 74–1502, at 3 (1936), *reprinted in* 4 *The Legislative History of the Federal Antitrust Laws and Related Statutes: Part I: The Antitrust Laws*, at 3013–14 (Earl W. Kintner ed., 1980) (*"The Antitrust Laws"*); *see also* H.R.Rep. No. 74–2287, pt. 1, at 6 (1936), *reprinted in* 4 *The Antitrust Laws*, at 3186; *see also Standard Motor Prods., Inc. v. FTC*, 265 F.2d 674, 676 (2d Cir.1959) (discussing history and intent of Robinson–Patman Act).

▮▮▮▮ The Robinson–Patman Act was therefore intended to apply to all commodities distribution contracts, in all positions in the distribution chain. There is no evidence that Congress intended that some distribution contracts would be exempted from the Act simply because the purchaser bought not only the commodity but also the right to distribute it on an exclusive or semi-exclusive basis. Applying the dominant nature test to distribution contracts merely because they include the right to distribute exclusively would render the Act's coverage dependent on the manner in which the parties have structured their contractual relationship, and on the market forces that determine whether an exclusive distributorship is suitable and the value of the distribution right in relation to the commodity price. Such an arbitrary result would contravene the Act's purpose of creating even competition throughout the market, at all levels of the distribution chain. A commodities contract's transfer of the exclusive right to distribute does not create an issue as to whether the contract is a commodities contract within the meaning of the Robinson–Patman Act.

▮▮▮▮ The existence of patented elements within the transferred product does not alter this conclusion. The district court's instruction suggested that even if the grant of the exclusive right to distribute cannot in itself exempt the contract from the Robinson–Patman Act, the patent appended to the product creates an issue as to whether the right to distribute renders the sale of that product a transaction primarily for the intangible right to exploit the patent. A product that is patented, or that contains patented elements, remains a commodity for purposes of the Robinson–Patman Act, however. Under the first sale doctrine, the purchaser's ability to exploit the product itself, including by re-selling or using that product, is not limited by the inclusion of patented technology within the product. *See Glass Equip. Dev., Inc. v. Besten, Inc.*, 174 F.3d 1337, 1342 n. 1 (Fed.Cir.1999) ("The first sale doctrine stands for the proposition that, absent unusual circumstances, courts infer that a patent owner has given up the right to exclude concerning a patented article that the owner sells."). Where the product transferred is patented, therefore, that fact alone does not require potential exclusive distributors to bargain for any additional rights than if the product were not patented. *See Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d 1094, 1102 (Fed. Cir.2001) ("The fact that an article is patented gives the purchaser neither more nor less rights of use and disposition."). At the same time, a purchaser that has obtained the physical product, absent more, has not also received the right to exploit the patent itself in any way. *See id.* Thus, contracts that do not explicitly transfer any intangible patent rights to the buyer in addition to the product itself are commodities contracts.[4] Because the pat-

4. In contrast, contracts that explicitly grant a license to exploit the intellectual property contained in a commodity have been viewed as primarily concerned with intangible rights, and are therefore not covered by the Act. *See, e.g., La Salle Street Press, Inc. v. McCormick &*

ent does not change the nature of the product itself or of the transaction, and the exclusive right to distribute a patented product is no broader or narrower than the exclusive right to distribute an unpatented product, contracts that transfer the exclusive right to distribute a patented product, without more, are covered by the Robinson–Patman Act as a matter of law.

■■■ The district court therefore erred in instructing the jury that if the dominant nature of the contract involved the "right to distribute a patented product," the Robinson–Patman Act would not apply. More fundamentally, the court also erred in instructing the jury that the dominant nature test applied to contracts in which the only intangible involved is the exclusive right to distribute the product, and in submitting the issue of whether the Distribution Agreement was covered by the Act to the jury.[5] Because it is undisputed that the pills that ALZA sold to Innomed are commodities within the meaning of the Robinson–Patman Act, and that ALZA retained all patent rights to the pills' timed-release technology, the Distribution Agreement is a commodities contract as a matter of law.

■■■ ALZA argues, however, that Innomed failed to object to the district court's charge, and that the charge does not constitute the fundamental error necessary to grant a new trial despite the lack of a timely objection. We agree. Innomed itself requested that the jury be instructed on the dominant nature test, and never argued to the district court that the Distribution Agreement involved commodities as a matter of law. Moreover, Innomed had the chance to object to the district court's proposed charge language at the charge conference, but failed to do so. Although Innomed now argues that it did not object because the judge instructed counsel not to repeat previous objections, Innomed had not yet raised any objection to the language at issue, and therefore would not have been prevented from raising it at the charge conference. Finally, Innomed did not object to the charge after the district court delivered it, and therefore forfeited this issue on appeal. *See Shade*, 251 F.3d at 313.

[20] Consequently, we may only review the charge for fundamental error. Although the charge was undoubtedly erroneous, it is impossible to conclude that the submission of the issue to the jury, as well as the language of the charge, clearly contravened existing law at the time. *See Parcel of Property*, 337 F.3d at 234. The error was not "so serious and flagrant" that it threatened the integrity of the trial, or deprived the jury of legal guidance in making its decision. *Shade*, 251 F.3d at 313. Moreover, given the number of ele-

---

*Henderson, Inc.*, 293 F.Supp. 1004, 1006 (N.D.Ill.1968) (holding that a contract selling a license to use a patented process in order to manufacture a product is a contract for an intangible right rather than a commodity); *Record Club of Am., Inc. v. Capitol Records, Inc.*, No. 70 Civ. 3315HRT, 1971 WL 558, at *3 (S.D.N.Y. Sept.8, 1971) (holding that contract granting right to manufacture and distribute copyrighted product in return for royalty payments involved an intangible right).

We express no opinion on whether contracts involving not only the sale of a patented product but also the right to exploit the patent

itself in some way, such as by permitting the manufacture of additional products, may be subject to the dominant nature test.

5. We express no opinion, however, on whether the application of the Robinson–Patman Act to a particular contract should always be decided as a matter of law. *Cf. First Comics, Inc.*, 884 F.2d at 1037 n. 5 (suggesting that court should always determine for itself whether transaction involves commodities, because "it is for the court to decide if a given transaction is within the meaning of a statutory term").

ments required to establish a *prima facie* case under the Robinson–Patman Act, and the complexity of both the contracts at issue and Innomed's theories of price discrimination, it is impossible to conclude with any certainty that the erroneous charge had an effect on the outcome of Innomed's claim. Innomed is therefore not entitled to a new trial because of the error in the district court's instruction.

## II. The District Court's Instruction on Antitrust Injury

Innomed next argues that the district court erred in instructing the jury, following expert testimony as to the injury that Innomed suffered as a result of the alleged price discrimination, that "[t]he injury that Innomed may have incurred under this claim can only arise from the disadvantage that [it] was placed at by the payments it actually made under the agreement. Thus, money that Innomed owed but did not pay under the agreement may not be included when and if you reach the damage aspect." Because Innomed objected to the court's instruction in a timely manner, Innomed has preserved its objection for appellate review, and we review the instruction *de novo. See Jin*, 310 F.3d at 91. In order to establish that it is entitled to a new trial, Innomed must demonstrate that it was prejudiced by the error in the charge. *See id.* Although we agree that the challenged instruction was erroneous, we find that because it pertains only to Innomed's entitlement to damages, rather than to the showing necessary to establish that ALZA violated the Robinson–Patman Act, the jury's verdict that ALZA did not commit price discrimination rendered the error harmless.

▮▮▮▮▮ Innomed asserted at trial that ALZA's alleged price discrimination had injured its ability to compete with Warner–Lambert, and that it was consequently entitled to treble damages under § 4 of the Clayton Act, 15 U.S.C. § 15 (2000). In order to establish that a violation of the Robinson–Patman Act warrants an award of treble damages, the plaintiff must establish that it has suffered actual economic injury as a result of the defendant's conduct. *See J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981) ("To recover treble damages, . . . a plaintiff must make some showing of actual injury attributable to something the antitrust laws were designed to prevent."). A plaintiff may establish economic injury by showing that its ability to compete has been harmed by the price discrimination; for instance, if the plaintiff distributor must charge higher prices than the favored distributors in order to cover its higher costs, and loses sales and profits as a result, then the plaintiff has suffered antitrust injury.[6] *Id.* at 564 & n. 4, 101 S.Ct. 1923. Because the concept of antitrust injury is not limited to payments that the plaintiff made to the discriminating seller, the fact that In-

---

**6.** Indeed, Innomed's theory of injury at trial, as advanced by its expert and in summation, was that it had suffered this standard type of competitive harm: because ALZA gave Warner–Lambert lower prices for the same pills, Warner was able to offer the pills at a lower price on the marketplace. As a result, Innomed's expert testified, Innomed lost customers who would have otherwise bought its pills, and was unable to make much of a profit from the distribution agreement. At the same time, Innomed was required by the Agreement to spend a set percentage of its sale proceeds on marketing the product. These difficulties alone, if credited, could have constituted sufficient evidence of business injury under *J. Truett. See Falls City Indus., Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 435, 437–38, 103 S.Ct. 1282, 75 L.Ed.2d 174 (1983) (holding that evidence that defendant's price discrimination forced plaintiff to charge higher retail prices for beer and suffered lost sales as a result was sufficient to establish injury).

nomed did not make some of its contract payments would not necessarily have negated its entitlement to treble damages, if it could establish that it had been injured in its ability to compete and had suffered losses as a result. The district court therefore erred in suggesting that Innomed's purported injury could arise only from contract payments that it actually made.

■ This error was harmless, however, because the instruction pertained only to Innomed's entitlement to treble damages, not whether ALZA had violated the Act in the first place. *See id.* at 562, 101 S.Ct. 1923 (noting that the Robinson–Patman Act is violated if the discriminatory practices *may* have injured competition, but that Clayton Act requires a showing that the plaintiff *has* been injured in order to merit treble damages). The district court clearly indicated that its injury instruction related only to the question of treble damages, stating that the jury should consider Innomed's injury "when and if you reach the damage aspect." Moreover, in its subsequent jury charge, the court correctly instructed the jury on the elements of a Robinson–Patman Act violation, and accurately stated that Innomed need only show that ALZA's purported discrimination could have affected competition. There is therefore no indication that the court's earlier instruction on injury affected the jury's deliberations as to whether ALZA had violated the Act. Moreover, the jury found that ALZA had not committed price discrimination, obviating the need to consider the question of Innomed's entitlement to damages for the violation. The erroneous instruction therefore did not affect the outcome of the trial. *See Patrolmen's Benevolent Ass'n of New York v. City of New York*, 310 F.3d 43, 54–55 (2d Cir.2002) (finding that jury's finding against defendant on one element of plain-

tiff's claim rendered harmless the error in the jury instruction as to another element, because the jury did not go on to consider second element).

### CONCLUSION

For the foregoing reasons, the district court's judgment as to Innomed's Robinson–Patman Act claims is affirmed.